*In re* BUCKLEY'S ESTATE.

1. INSANE PERSONS—ALLOWANCES TO COLLATERAL KINDRED.

Allowances to collateral kindred from the estate of an insane person may be made by a probate court, where the needs of the insane person are provided for and the kindred are greatly in need of financial assistance, upon the theory that the insane person would, if sane, grant the petition; the amount and proportion of the allowance resting in the sound discretion of the court.

2. COURTS—PROBATE COURT—STATUTES—EQUITY.

Probate courts have statutory powers and certain equity powers especially in connection with the care and protection of the estates of wards.

3. INSANE PERSONS—ALLOWANCES TO COLLATERAL KINDRED—SUR-PLUS INCOME.

Statute empowering the guardian of the estate of an insane person to apply the income and profits to the support of the ward and his family and authorizing the probate court to give such directions as the case may require for managing, investing and disposing of the estate in the hands of the guardian, authorized an order distributing a sum from the

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 3–5] 25 Am Jur, Guardian and Ward, § 79.
[1, 3–5] Right of court or guardian to use funds of incompetent for benefit of others than incompetent. 59 ALR 653; 160 ALR 1435.
[2] 25 Am Jur, Guardian and Ward, § 17.

estate of the ward to latter's needy brothers and 'sisters where accumulated surplus income was greatly in excess of the amount necessary to maintain the ward and make distribution sought (CL 1948, §§ 703.20, 703.22).

4. SAME—SUPPORT OF FAMILY—CONSTRUCTION OF TERM "FAMILY." The term "family" as used in statute authorizing support thereof from the estate of an insane person, is not confined to those individuals to whom the ward owes a legal duty to support, is flexible and is to be determined from the circumstances of each case (CL 1948, § 703.20).

5. SAME—CONSTRUCTION OF TERM "FAMILY." The term "family," as used in provision of recently-enacted probate code authorizing support of the family of an insane person from the estate of the latter, is to be given a liberal interpretation, since such interpretation would, appear to be more consistent with the general legislative plan and purpose (CL 1948, § 703.20).

Appeal from Manistee; Neal (Max E.), J. Submitted January 5, 1951. (Docket No. 55, Calendar No. 44,925.) Decided April 3, 1951.

In the matter of the estate of Edith Hampton Buckley, mentally incompetent. Petition of Carrie H. Renick for order allowing sums for her support from incompetent's estate. Next of kin join in the petition. Order entered. The guardian appealed to circuit court where the order was affirmed. Guardian appeals. Affirmed.

*Charles N. Belcher* and *Thomas G. Long,* for next of kin.

*R. L. Miles,* for guardian.

CARR, J. The facts in this case are not in dispute. On December 1, 1947, the probate court of the county of Manistee made an order directing the guardian of Edith Hampton Buckley, a mentally-incompetent

person, to pay to the brothers and sisters of the ward, comprising all of her next of kin, sums aggregating $30,000 out of accumulated surplus income in her estate, such payment to be regarded as a loan and to be evidenced by a promissory note. The money was not paid. Subsequently, on September 15, 1949, on petition of the brothers and sisters of the ward, a supplemental order was made expressly approving the prior order and providing that notes to be given by the petitioners should be payable on the death of Mrs. Buckley. From such order the guardian appealed to the circuit court, where the action of the probate court was affirmed. An appeal to this Court has been taken, it being the position of the guardian that the order of the probate judge was entered without authority of law and is, in consequence, invalid.

Mrs. Buckley became hopelessly insane in 1913 and in 1916 was committed to the Traverse City State Hospital, where she has since remained, as a private patient. The record indicates that she was married to Edward Buckley in October, 1911, and that the parties entered into an antenuptial agreement under which Mr. Buckley assumed the obligation of executing a will containing provisions for an income to her for her support and giving her the right to dispose, by her will, of $100,000 of his estate. Mr. Buckley died on August 26, 1927, leaving a last will and testament containing provisions of the character contemplated by the antenuptial agreement. His estate was administered in accordance with such will.

The annual expense of supporting Mrs. Buckley in the institution is somewhat less than $2,000, while her share of the annual income from her husband's estate is from 4 to 5 times that sum. At the time of the making of the order in question here the accumulated surplus from income was approximately $150,000. It also appears that some years previously a petition was filed by all of the brothers and sisters

of Mrs. Buckley, her next of kin, representing that
they were in poor financial circumstances and that
their sister, if competent, would make provision for
them. The probate court found that Mrs. Buckley
was incurably insane, that she would remain in the
institution for the rest of her life, that the funds in
the hands of her then guardian were greatly in excess
of any foreseeable future needs of the ward, that
she would have assisted petitioners had she been
competent, and that the petitioners were in dire need
of such assistance. On July 27, 1938, an order was
made directing the payment to the petitioners of
various sums aggregating $35,000. Such order was
complied with by the then guardian of Mrs. Buckley.

The order of December 1, 1947, which, as before
noted, was confirmed by subsequent action of the
probate court on September 15, 1949, was based on
substantially the same findings as were set forth
in the order entered in 1938. The probate judge
determined from the testimony and from affidavits
that Mrs. Buckley was at the time hopelessly insane,
that a large surplus was being accumulated from the
property set aside in trust by Mr. Buckley, that such
surplus was increasing rapidly, that the petitioners
were in need, and that their sister if she were of
sound mind would provide for them although under
no legal obligation to do so. The factual findings on
which the orders herein questioned were based are
conceded by the appellant, Mrs. Buckley's present
guardian. The question at issue is whether, in view
of all the circumstances of the case, the probate court
had the requisite authority to make the orders.

The right under proper circumstances to order
allowances to collateral kindred out of the surplus
income of an incompetent ward has been recognized
and exercised by the English chancery courts. One
of the leading cases on the subject is *Ex parte Whit-
bread,* 2 Merivale 99 (35 Eng Rep 878). The ques-

tion there at issue had reference to increasing payments, provided for by prior orders, out of the property of an insane person for the benefit of his brothers and sisters. In commenting on the situation it was said, in part:

"With this view only, in cases where the estate is considerable, and the persons who will probably be entitled to it hereafter are otherwise unprovided for, the court, looking at what it is likely the lunatic himself would do, if he were in a capacity to act, will make some provision out of the estate for those persons. So, where a large property devolves upon an elder son, who is a lunatic, as heir at law, and his brothers and sisters are slenderly or not at all provided for, the court will make an allowance to the latter for the sake of the former; upon the principle that it would naturally be more agreeable to the lunatic, and more for his advantage, that they should receive an education and maintenance suitable to his condition, than that they should be sent into the world to disgrace him as beggars. So also, where the father of a family becomes a lunatic, the court does not look at the mere legal demands which his wife and children may have upon him, and which amount, perhaps, to no more than may keep them from being a burthen on the parish,—but, considering what the lunatic would probably do, and what it would be beneficial to him should be done, makes an allowance for them proportioned to his circumstances. But the court does not do this because, if the lunatic were to die tomorrow, they would be entitled to the entire distribution of his estate, nor necessarily to the extent of giving them the whole surplus beyond the allowance made for the personal use of the lunatic.

"The court does nothing wantonly or unnecessarily to alter the lunatic's property, but on the contrary takes care, for his sake, that, if he recovers, he shall find his estate as nearly as possible in the same condition as he left it, applying the property in the mean-

time in such manner as the court thinks it would have been wise and prudent in the lunatic himself to apply it, in case he had been capable.

"The difficulty I have had was as to the extent of relationship to which an allowance ought to be granted. I have found instances in which the court has, in its allowances to the relations of the lunatic, gone to a further distance than grand-children—to brothers and other collateral kindred; and if we get to the principle, we find that it is not because the parties are next of kin of the lunatic, or, as such, have any right to an allowance, but because the court will not refuse to do, for the benefit of the lunatic, that which it is probable the lunatic himself would have done."

The above case has been repeatedly cited and has been followed by the English courts in later decisions. The principle recognized has also been approved in this country. One of the leading cases is *In re Flagler,* 248 NY 415 (162 NE 471, 59 ALR 649). There the incompetent was a widow 78 years of age having no descendants and incurably insane. She had an annual income far in excess of any demands for her own benefit, comfort and enjoyment. A cousin, greatly in need of financial assistance, petitioned for an allowance out of surplus income. Testimony was taken before a referee who reported that upon the evidence he was satisfied that "if Mrs. Flagler were now competent and the condition of the petitioner were now presented to her, she would grant the petition." The appellate court concluded that the petitioner was entitled to relief, saying in part:

"Allowances for the support of collateral relatives of the incompetent have been made 'upon the theory that the lunatic would, in all probability, have made such payments if he had been of sound mind.' (*Matter of Lord,* 227 NY 145 [124 NE 727].) The appellate division correctly held that the allowance made

at special term may be justified upon no other theory. Upon an examination of the record we find that the evidence leads logically to the conclusion that Mrs. Flagler, if sane, would to-day provide some relief for the petitioner."

An order was accordingly entered for the payment of a specific sum to enable the petitioner to save her home and for a further allowance for her support. This case is reported in 59 ALR 649 where it is followed by an annotation citing and discussing numerous decisions, both in England and in this country, relating to the legal proposition. A supplemental annotation will be found in 160 ALR 1435.

In 25 Am Jur, p 52 it is said:

"The family of an insane person ordinarily is entitled to support and maintenance from his estate. In a proper case, therefore, the court may authorize an allowance from the funds of an incompetent ward for the support and maintenance of the latter's husband or wife, children, or parents. Also, a court of equity has power out of the surplus income of the estate of an insane person to provide for the support of persons whom the insane person is not under legal obligation to support, where it specifically appears that the insane person himself would have provided for such support had he been sane. The court in making such allowances acts for the insane person as it supposes he himself would have acted if he had been of sound mind, and the amount and proportion of allowances thus made rest entirely within the discretion of the court."

Of like import is 44 CJS, pp 242, 243, where decisions in this country are summarized as follows:

"Where the needs of an incompetent are provided for, a court having jurisdiction of his estate may, sometimes by virtue of statutory provision, make allowances out of the estate for the support of collateral kindred and other persons whom the ward

would naturally wish to support, although under no legal obligation to do so.  In deciding whether such allowances should be made, the court should determine what the ward would himself do if he were sane, and act accordingly, and where it is not established that the ward would have done so if sane the court ordinarily will not make allowances for such persons, even though the estate is sufficiently ample.

"Great caution should be exercised with respect to making allowances to persons for whom the ward is not legally bound to provide; and it has been said that the practice ought rather to be narrowed than extended.  While such allowances may be granted even though payments would be required to be made out of principal and not out of income, where the payments would involve an infringement on the corpus of the estate it must be made to appear, even more clearly and convincingly than where there is surplus income available, that the incompetent, if sane, would assume the burden of supporting the applicant.  It has been held that the applicant must be without adequate means of support and is dependent on the bounty of others, and that the absence of opposition from other relatives or the committee of the incompetent, or the applicant's financial distress and relationship to the incompetent, are not alone sufficient to warrant granting an allowance."

It has been repeatedly declared by this Court that probate courts have no inherent powers but only special statutory jurisdiction.  *MacKenzie* v. *Union Guardian Trust Co.,* 262 Mich 563; *In re Graham's Estate,* 276 Mich 321; *In re Estate of Fraser,* 288 Mich 392.  It has also been recognized that courts of probate have certain equity powers.  In the case of *People, ex rel. Campau,* v. *Circuit Court for the County of Wayne,* 11 Mich 393 (83 Am Dec 754), it was said, Justice CAMPBELL writing for the Court:

"I am very strongly inclined to the opinion that under our probate system the court of chancery has

only jurisdiction in those cases in which an adequate remedy does not exist in the probate court.

"That there are some such cases there is no doubt, but there is as little doubt that a very large portion of the old equity jurisdiction has been vested in the courts of probate."

The foregoing decision was cited with approval in *Re Estate of Andrews,* 92 Mich 449 (17 LRA 296), where the Court commented further:

"Under our statute, probate courts have jurisdiction not only as to all matters relating to the settlement of estates of deceased persons, but as to the estates of minors, and all others under guardianship. That jurisdiction embraces not only the appointment of guardians, and control over their official conduct, but the care and protection of the estate of the wards. Indeed, the grant of jurisdiction to probate courts is so general and extensive under our statute that to the section conferring jurisdiction the legislature added a proviso that such grant should not be construed to deprive circuit courts in chancery of concurrent jurisdiction."

The statutory provision referred to by the Court in the statement above quoted appears in the present probate code, PA 1939, No 288, ch 1, § 19 (CL 1948, § 701.19 [Stat Ann 1943 Rev § 27.3178(19)]). It may, we think, be fairly regarded as implying a recognition of the vesting of equitable powers by statute in the probate court. In *Re McLouth's Estate,* 281 Mich 191, it was said:

"The probate court of Michigan had jurisdiction to hear the set-off in the instant case. It is a constitutional court with statutory jurisdiction but it nevertheless exercises equitable powers. In *Brooks v. Hargrave,* 179 Mich 136, 145, the Court said:

" 'Probate courts are not courts of law, strictly speaking. *Rodgers* v. *Huntley,* 166 Mich 129. They exercise equitable powers as well.' "

See, also, *Nolan* v. *Garrison,* 156 Mich 397; *Farr* v. *Whitefield,* 322 Mich 275. Obviously there is no inconsistency between statements that probate courts derive their authority from the statutes and that they have equitable powers, powers of that nature having been granted to them by the legislature.

This brings us to a consideration of the crucial question at issue in the case, that is, whether the present probate code* may properly be construed as sanctioning the order in question here. Chapter 3, § 1, of the code (CL 1948, § 703.1 [Stat Ann 1949 Cum Supp § 27.3178(201)]) provides for the appointment of guardians of estates of insane persons. Section 20 of the same chapter (CL 1948, § 703.20 [Stat Ann 1943 Rev § 27.3178(220)]), in effect at the time of the making of the orders involved in this case, provided for the management of the estate of the ward and directed the guardian to apply the income and profits thereof to the support of the ward and "his family, if there be any." By PA 1949, No 125, section 20, was in terms repealed and the pertinent provisions thereof merged in chapter 3, § 17 of the code (CL 1948, § 703.17, as amended [Stat Ann 1949 Cum Supp § 27.3178(217)]) which directs the guardian to pay "all expenses incurred in the care, support or comfortable and suitable maintenance of such ward, and his family if there be any, as may be approved by the judge of probate." Section 22 of the chapter (CL 1948, § 703.22 [Stat Ann 1943 Rev § 27.3178(222)]) provides for the making of investments in such manner as shall be for the interest of all concerned, and authorizes the probate court to "make such further orders, and give such directions, as the case may require, for managing, investing and

---

* PA 1939, No 288, as amended (CL 1948, § 701.1 *et seq.,* as amended by PA 1949, Acts Nos 6. 45, 46, 51. 78. 88. 109. 125, 145, 167 [Stat Ann 1943 Rev and 1949 Cum Supp § 27.3178(1) *et seq.*]).

disposing of the estate and effects in the hands of the guardian."

It will be noted that the legislature has not undertaken to define the term "family" as used in the statute. It is not restricted to those individuals to whom, under the statutes of the State, the ward owes a legal duty of support. It is not limited to wife and children, but obviously is used in the sense in which it has been employed in the past in connection with the management and control of the estates of persons under guardianship, including insane wards. The trend of judicial decisions in this State and elsewhere has been toward a flexible definition, to accord with the legislative purpose in each instance. As said in *Carmichael* v. *Northwestern Mutual Benefit Association*, 51 Mich 494:

"Now this word 'family,' contained in the statute, is an expression of great flexibility. It is applied in many ways. It may mean the husband and wife having no children and living alone together, or it may mean children, or wife and children, or blood relatives, or any group constituting a distinct domestic or social body. It is often used to denote a small select corps attached to an army chief, and has even been extended to whole sects, as in the case of the Shakers.

"We discover nothing in the statute implying a narrow sense, and we should not be inclined to attribute one where the result would cause injustice."

See, also, *Hosmer* v. *Welch*, 107 Mich 470; *Boston-Edison Protective Association* v. *The Paulist Fathers, Inc.*, 306 Mich 253 (148 ALR 364). In *Re Freeman's Estate*, 171 Miss 147 (157 So 253), the statute involved provided for the support of the family of an insane ward out of his estate. The question arose in the case whether the ward's stepmother could be regarded as a member of his family. In commenting on the situation it was said:

"The word 'family,' as defined by the lexicographers, is one of broad meaning and may include persons whom the ward, under normal conditions, would be under no legal duty to support. The measure of a guardian's authority to apply any part of the ward's estate to the maintenance and support of the ward's family is found in the mentioned statute, but the statute nowhere defines the word 'family' in this connection. Consequently, the question of who is and who is not a member of the ward's family within the meaning of this statute must be determined from the particular facts involved, and by a process of inclusion and exclusion. The word will always be construed to include those whom the ward, under normal conditions, would be under legal duty to support, such as his wife and dependent children, and under some circumstances may include others. In *Ex parte Phillips,* 130 Miss 682 (94 So 840), the court declined to give a definition of the word that would be applicable in all cases, but held that a dependent mother would be included where the ward was unmarried, and lived with her, and contributed to her support before he became insane.

"Under the particular facts of the case at bar, insofar as the right to support out of the estate of the ward is concerned, we think the stepmother stands in the same attitude as would a natural mother. The record discloses that she became the ward's stepmother when he was an infant of tender years; that she dutifully cared for and nurtured him throughout the period of his infancy; and that he contributed to her support until he was inducted into the army during the world war. We should not be understood to hold that in all cases a stepmother would be held to be a member of the ward's family who is entitled to the support authorized by this statute; but under the particular facts here involved, we think the chancellor was correct in making the allowance for the support of the dependent stepmother."

While the facts involved in *Citizens State Bank of Trenton* v. *Shanklin,* 174 Mo App 639 (161 SW 341), are not parallel to those in the case at bar, the following comment of the court in discussing legal propositions argued before it, and authorities cited, is of interest.

"From these we gather that the probate court handling a ward's estate through his guardian, is not tied with legal restraint to the extent that it is when supervising and directing an administrator. It seems the court, if the estate will justify it, may authorize to be done what it is convinced the insane person would have done had he been in his right mind. Thus allowances, in certain circumstances, may be made for support of a bastard child, for collateral kin, for uncles and aunts, for usual contribution to the church; *In the Matter of Willoughby,* 11 Paige Ch (NY) 257; *In the Matter of Heeney,* 2 Barb Ch (NY) 326."

In *State, ex rel. Kemp,* v. *Arnold,* 234 Mo App 154 (113 SW2d 143), the question at issue was the jurisdiction of the probate court to enter an order against the estate of an insane person under guardianship for the support of a relative of the ward where the relation was not such as to create a legal liability upon the ward for the petitioner's support. Citing *Citizens State Bank of Trenton* v. *Shanklin, supra,* it was said in part:

"While this would appear to be the first case to reach an appellate court of this State directly involving the question of the right of the probate court to make an allowance for the support of a person to whom the incompetent owes no legal duty of support, there is authority to be found upon the question in other jurisdictions, which hold rather uniformly that the court which has control over the guardianship of the incompetent, whether it be a probate or a chancery court, may authorize such an

allowance to be made where there is sufficient evidence adduced at the hearing on the application to satisfy the court that the incompetent, if he were sane, would himself make the contribution. * * *

"Recognizing the necessity for showing statutory authority for the exercise of any particular jurisdiction on the part of the probate court, relator insists that respondent's jurisdiction to make the allowance in question is conferred by section 475, Revised Statutes Missouri 1929 (Mo Stat Ann, § 475, p 293),* which provides that 'every probate court, by whom any insane person is committed to guardianship, may make an order * * * for the support and maintenance of his family, and education of his children, out of the proceeds of such estate.'

"It is conceded that the ultimate result in this case must depend upon the meaning to be ascribed to the word 'family' as it is used in the above statute. Relator argues that the word is broad enough to include any person who lives under the same roof with the incompetent who is the head of the family, and to whom the incompetent owes either a legal or else a mere moral duty of support, while respondent takes the position that the statute does not have the effect of imposing any new legal obligations upon the citizens of this State; that it is only intended to lodge in probate courts the power to enforce existing legal duties; and that the word 'family,' as used in the statute, should therefore be properly construed to comprehend only those persons whom the incompetent would be legally liable to support and maintain if he were sane, which construction would of course confine the probate court's jurisdiction to the making of allowances for the support and maintenance of the incompetent's wife and minor children. * * *

"In this instance there is nothing to indicate that the word 'family' has been used in section 475, *supra,* in other than the broad and primary sense in which it is commonly used even in statutes having to do

---

* See Mo Rev Stat Ann § 474.—R<small>EPORTER</small>.

with administration matters arising before the probate court, and if it had been intended that it should be given its narrow and restricted meaning in the particular statute and that the power of the probate court should be limited to orders for the support and maintenance of only such persons as the incompetent was legally liable to support, not only could the legislature have very easily made its intention clear, but it would undoubtedly have taken the pains to do so. Indeed it is of interest to note that in the few reported cases coming to our attention in which the courts of other States have been called upon to construe local statutes similar to our own in both language and purpose, they have uniformly accorded their own statutes the same liberal construction that we think should be accorded ours. (*Seley* v. *Howell,* 115 Tex 583 [285 SW 815] ; *In re Freeman's Estate,* 171 Miss 147 [157 So 253] ; *In re Phillips' Estate,* 130 Miss 682 [94 So 840].)

"We cannot escape the conclusion, therefore, that under section 475, *supra,* the probate court has been invested with the jurisdiction to entertain and act upon an application for an allowance to be made out of an incompetent's estate for the support and maintenance of one who is a member of his family in the broad and liberal sense of the term, even though the degree of relationship is not such as to entail upon the incompetent any legal liability for the petitioner's support. This does not mean that the court is to be motivated by what might perchance be its own personal ideas or generous impulses regarding what would constitute a proper disposition of the incompetent's estate or income, but if it is shown to the satisfaction of the court that the petitioner is properly to be regarded as a member of the incompetent's family within the sense in which the term has been used in the statute, that he is in actual need of support and has the moral right to look to the incompetent for assistance, and that the incompetent's estate is of sufficient proportions to warrant an allowance to be made, then the court, if convinced

from all the facts and circumstances in evidence that the incompetent, if sane, would wish either to assume such a moral obligation towards the petitioner or else to continue the same if assumed prior to the adjudication of his incompetency, may authorize such an allowance to be made as is commensurate with the exercise of a sound judicial discretion in the case."

In accord with the Missouri decision above cited is *In re Guardianship of Brice,* 233 Iowa 183 (8 NW 2d 576). There the nephew of an incompetent ward filed a petition in the probate court having jurisdiction over the ward's estate, setting up his financial condition, alleging that he needed assistance, and claiming further that his uncle had made contributions to him up to the time of incompetency. He asked that the guardian be authorized to pay him $250 per month. It further appeared that the petitioner was the sole prospective heir of the ward, who was incurably insane and a man of considerable wealth. The statute there involved did not contain the specific provision appearing in the Michigan act with reference to the support of the family of an incompetent under guardianship. It was held by the majority of the court, however, that under general provisions of the code giving to the probate court jurisdiction over the management of estates of insane wards the order sought by petitioner was proper. In reaching such conclusion it was said:

"The question involved upon this appeal has never been passed upon by this court. However, there is considerable outside authority to the effect that courts have wide powers in directing the management of an incompetent's estate and in a proper case may authorize an allowance to one to whom the ward owes no legal duty to support. In such matters the court may direct that to be done which the incompetent, if sane, would probably have done. The power

of the court in such matters has been likened to its right to authorize donations by a guardian for charitable purposes to which the incompetent had formerly been in the habit of making contributions. * * *

"In determining whether the incompetent, if sane, would contribute to the support of a relative to whom he owes no duty of support, the court will consider the needs of the relative, the relationship and intimacy which he bore to the incompetent prior to the adjudication of incapacity, the present and probable future requirements of the incompetent himself, whether others are dependent upon him for support and the extent of such dependency, the size and condition of the estate—giving to these and any other pertinent matters such weight as the incompetent, if sane, probably would have given. *In re Fleming's Estate,* 173 Misc 851 (19 NYS2d 234, 236) and cases cited.

"While courts should act cautiously in making an allowance to one whom the incompetent is under no legal duty to support, having in mind at all times the welfare of the ward, this case seems properly to fall within the rule of these authorities. The ward, now over 82 and without dependents, appears to be incurably insane. So far as possible, all his needs and comforts are provided for. The estate is well in excess of a million dollars. The applicant is destitute. He and his wife are unable to work. The trial court found that the incompetent, in all probability, if sane, would provide for the support of the applicant and his family. There is ample evidence to support the finding."

The reasons given for the foregoing decisions may well be applied to the facts in the case at bar. Under the statute jurisdiction with reference to the management of the estate of the insane ward is vested in the probate court of Manistee county. Mrs. Buckley's rights are not imperiled by the orders in question. Her portion of the income accruing from year

to year from the trust created by the will of her husband greatly exceeds her needs. It is undisputed that were she able to do so she would assist the petitioners, her next of kin. If she can be said to have a family at all within the meaning of the statute, obviously it consists of her brothers and sisters.

We do not think that it was the intention of the legislature to limit the meaning of the term in question to those persons to whom an incompetent owes a legal duty to support, wholly or in part. A liberal interpretation is more consistent with the general legislative plan and purpose. This is particularly so in view of the fact that the legislature has seen fit to invest the probate courts with equitable powers. It is apparent that in doing so consideration was given to prior equity jurisdiction. The terms used and the specific powers granted must be construed accordingly. Had it been intended that a narrow or restricted meaning should be given to the word "family," we may assume that appropriate language would have been used to indicate such intent. The fact that this was not done indicates conclusively that the term was employed in its broad and commonly-accepted meaning. We think that the circuit judge came to the correct conclusion in sustaining the action of the probate court.

The order is affirmed, with costs to appellees.

REID, C. J., and BOYLES, NORTH, DETHMERS, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.