773 So.2d 118 (2000)
Thomas RAINEY and Kim Deshazo, Appellants,
v.
GUARDIANSHIP OF Myrtle MACKEY, Appellee.
No. 4D00-2018.
District Court of Appeal of Florida, Fourth District.
December 20, 2000.
Steven L. Perry of McCarthy, Summers, Bobko, Wood, Sawyer & Perry, P.A., Stuart, for appellants.
Robert L. Donald of Law Office of Robert L. Donald, Fort Myers, for Amicus Curiae Elder Law Section of The Florida Bar.
Robert L. Donald of Law Office of Robert L. Donald, Fort Myers, for Amicus Curiae Elder Law Section of The Florida Bar.
No appearance for appellee.
POLEN, J.
Thomas Rainey, as guardian of the person of Myrtle Mackey, and Kim Deshazo, as guardian of the property of Myrtle Mackey (hereinafter "guardians"), timely appeal after the court denied their petition to implement Medicaid planning on behalf of Mackey. They argue that the court erred in failing to hold an evidentiary hearing on their petition and in failing to apply the correct standard in determining whether to permit Medicaid planning. We agree and reverse.
Mackey, 86, who lives in a skilled nursing home, was declared totally incapacitated and, as a result, plenary guardians of both her person and property were appointed. At the time her guardianship was established, she had approximately $78,725 in assets, a monthly income of $980.97, and a monthly deficit of $4,377.78.
Her guardians filed a verified petition with the court to authorize Medicaid planning. They alleged that Mackey's life expectancy was 6.2 more years, and that she would deplete all of her assets to pay for her nursing expenses in 10.64 months. They sought to undertake Medicaid planning by gifting to Mackey's only daughter, *119 the sole beneficiary under her will, the sum of $3,000 per month from Mackey's available assets.[1]
By the date of the hearing on the petition, the guardians had already spent on behalf of Mackey approximately $32,000. The court, however, would not accept evidence, only the proffer of two witnesses, Deshazo and Michael Connors. Deshazo proffered that she has known Mackey and her daughter for years, that Mackey and her daughter shared a close personal relationship, that Mackey opened up two joint bank accounts in her and her daughter's names, and that Mackey wanted to provide for her daughter in the event of her [Mackey's] death. Connors, a specialist in elder law, proffered that Medicaid planning is a common tool used to preserve the estate of a ward for intended beneficiaries, as well as a tool for estate and income tax planning. He also proffered that Medicaid planning was legally permissible and would not result in any penalty to Mackey. Nevertheless, the court found that it was not in the best interest of the ward to allow Medicaid planning, and denied the petition. This appeal followed.
The necessary starting point is section 744.441, Florida Statutes (1999), which provides in part,
After obtaining approval of the court pursuant to a petition for authorization to act, a plenary guardian of the property, or a limited guardian of the property within the powers granted by the order appointing the guardian or an approved annual or amended guardianship report, may:
* * * *
(17) Make gifts of the ward's property to members of the ward's family in estate and income tax planning procedures.
* * * *
(21) Enter into contracts that are appropriate for, and in the best interest of, the ward.
§ 744.441(17), (21), Fla. Stat. (1999). Under these sections, the guardians argue that they were authorized to transfer Mackey's assets to permit her to become Medicaid-eligible for the cost of her nursing home care. They maintain that such prudent Medicaid planning would allow Mackey to preserve some of her assets for her daughter, the undisputed natural object of her bounty and sole heir under her will.
The Medicaid program was established in 1965 in Title XIX of the Social Security Act. 42 U.S.C. §§ 1396-1396v. Its purpose is to provide "federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).[2]
After the program was enacted, there was concern over the widespread divestiture of assets by mostly wealthy individuals so that those persons could become eligible for Medicaid benefits. As a result, Congress enacted laws that imposed periods of ineligibility for such benefits where the applicant divested himself or herself of assets for less than fair market value.[3]
*120 Nevertheless, and despite Congress' attempts to criminalize such transfers,[4] the current law still exempts certain transfers from Medicaid ineligibility.[5] Otherwise, under Florida Administrative Code Rule 65A-1.712(d) and 42 U.S.C. § 1396p(c)(2)(C)(ii), a burden is placed upon the applicant to prove any transfer of funds without fair compensation occurred exclusively for a reason or purpose other than to become eligible for Medicaid benefits. Longhi v. State, Dept. of Health and Rehabilitative Services, 691 So.2d 583, 584 (Fla. 1st DCA 1997); Pentuik v. Department of Health and Rehabilitative Services, 584 So.2d 1098, 1100 (Fla. 1st DCA 1991). If the applicant does not meet that burden, Florida law presumes that the gratuitous transfer occurred to make the applicant eligible for Medicaid and, as a result, a penalty may be imposed. Fla. Admin. Code r. 65A-1.712(d).
While the Second District Court of Appeal has recognized that a guardian may transfer a disabled person's assets to reduce death taxes, see In re Guardianship of Bohac, 380 So.2d 550 (Fla. 2d DCA 1980), no Florida case has addressed a guardian's request to "spend down" an incompetent person's assets in order to qualify that person for Medicaid. The guardians cite to one New York case in which an appellate court held that a guardian could gratuitously transfer the ward's assets to his nondisabled, adult children in order to qualify the ward for Medicaid. Matter of John XX, 226 A.D.2d 79, 652 N.Y.S.2d 329 (1996), leave to appeal denied, 89 N.Y.2d 814, 659 N.Y.S.2d 854, 681 N.E.2d 1301 (1997). In that case, the guardian argued that if the ward were competent, he would have chosen to engage in the same form of Medicaid and estate planning to preserve a larger portion of his estate for his daughters. In fact, the ward's will left his entire estate to his daughters. The county Department of Social Services and the facility where the ward resided both opposed the guardian's petition. The court granted an order allowing the proposed Medicaid planning, and the department appealed.
The appellate court affirmed the trial court's order. It explained that given the *121 fact that the cost of the ward's care ultimately could exhaust his resources, it could not be "reasonably contended that a competent, reasonable individual in his position would not engage in the estate and Medicaid planning proposed in the petition." Id. at 331. The court noted that although the ward did not have a prior pattern of gift giving, he never manifested an intention inconsistent with the proposed transfer, and that his daughters were the natural objects of his bounty. It characterized the guardian's proposed Medicaid plan as prudent. According to the court, "a contrary conclusion would have the effect of depriving incapacitated persons of the range of options available to competent individuals." Id. at 332.
Like the proposed plan in the instant appeal, the guardian's proposed transfer in John XX apparently did not fall within any of the exemptions from Medicaid ineligibility under 42 U.S.C. § 1396p(c)(2). The difference in John XX, however, is that the guardian there proposed to transfer only a portion of the ward's assets to his daughters. After the transfer, there would have been sufficient funds to pay for the ward's nursing home care during the period of Medicaid ineligibility.
Because no evidentiary hearing was held, the record in the instant case does not allow this court to determine whether after the transfer there would be a period of ineligibility before Mackey could qualify for Medicaid benefits,[6] and, if so, whether there would be sufficient funds to pay for Mackey's nursing care during this period of ineligibility. Accordingly, we believe an evidentiary hearing is warranted.

Substituted Judgment Standard
The guardians also contend that the probate court applied the wrong standard in denying their petition. States generally utilize one of two prevalent standards for decisionmaking by guardians on behalf of their wards. One of these is the "best interests" standard, which "mirrors the view that the guardian's duties are akin to those imposed on a parent. Under this standard, the charge of the guardian is to make an independent decision on behalf of the ward." See Michael D. Cassasanto et al., A Model Code of Ethics for Guardians, 11 Whittier L.Rev. 543, 547 (1989). The other standard, "substituted judgment," requires surrogate decision-makers to act as they feel the wards themselves would act. This standard places the guardian in the shoes of the ward when making decisions. In other words, the court substitutes its judgment for that of a disabled person and does what the disabled person could have done for himself or herself if able. See In re Marriage of Drews by Drews, 139 Ill.App.3d 763, 94 Ill.Dec. 128, 487 N.E.2d 1005, 1005 (1985), affirmed, 115 Ill.2d 201, 104 Ill.Dec. 782, 503 N.E.2d 339 (1986).[7]
Although very few Florida courts have really addressed either standard of decision-making in the area of guardianship law, those courts, including the supreme court, have adopted the "substituted judgment" standard. See John F. Kennedy Memorial Hosp., Inc. v. Bludworth, 452 So.2d 921 (Fla.1984); In re Guardianship of Bohac, 380 So.2d 550 (Fla. 2d DCA 1980). In Bohac, the second district explained that in determining whether to substitute the guardian's judgment for that of the ward, courts should consider *122 donative intent, the permanency of the ward's condition, the size and nature of the ward's estate, the needs of the ward and the proposed recipients, the extent to which the recipients of the gifts may vary from those who would inherit in the natural course of events, the affinity or intimacy between the ward and the recipients, and whether they are dependent upon the ward for support. 380 So.2d at 553 n. 7 (citations omitted).
In this case, the probate judge concluded that Medicaid planning was not "the best avenue for the well[-]being of the ward." It concluded that spending down her assets was neither necessary nor essential to maintaining Mackey's well[-]being. Its language suggests that the court employed the "best interests" standard rather than the "substituted judgment" standard. Our conclusion is supported by the failure of the court to have expressly considered any of the Bohac factors in denying the petition. Therefore, on remand, we direct the court to reevaluate the guardians' petition under the substituted judgment standard.

Discretion
The guardians further ask that on remand we specify that the probate court essentially lacks discretion to deny the petition if there is competent substantial evidence to support it. We disagree with this position. First, it is unclear whether this form of Medicaid planning is even authorized under state or federal law. Second, section 744.441 makes clear that the court must approve any proposed exercise of power by the guardian. As no specific criteria are set forth for the trial court, the approval or disapproval of a specific exercise of power under section 744.441 by a guardian falls within the discretion of the trial court, using the substituted judgment standard as set forth above. Courts must make room for the possibility that some children may try to pressure vulnerable parents into divesting themselves of assets so that the estate is not depleted by the costs of nursing home care. The conflict of interest that can arise is tempered by the necessary discretion of the court, and we are not prepared to eliminate that discretion.
REVERSED and REMANDED for further proceedings in accordance with this opinion.
GUNTHER and STEVENSON, JJ., concur.
NOTES
[1] They also requested that the guardians serve Mackey under a lifetime contract of $10,000. The court specifically denied this request, and its ruling in this respect is not being challenged on appeal.
[2] Florida participates in the federal Medicaid program. § 409.901 et seq., Fla. Stat. (1999); 65 Fla.Admin.Code r. 65A-1.712.
[3] Both federal and Florida law impose a period of Medicaid ineligibility when an institutionalized individual disposes of assets for less than fair market value on or after the "look-back date" of 36 months before applying for medical assistance. 42 U.S.C. § 1396p(c)(1)(A); 42 U.S.C. § 1396p(c)(1)(B)(i); Fla. Admin. Code r. 65A-1.712(3). The term "look-back period" refers to the length of time Medicaid "looks back" from the date of the Medicaid application to scrutinize all asset transfers made by the applicant in order to determine the applicant's Medicaid eligibility date. If an asset is transferred during the "look-back" period, the applicant is subject to a "penalty period." Fla.Admin.Code r. 65A-1.712(c), (d).

Moreover, federal law, under 42 U.S.C. § 1396a(a)(10)(A)(ii)(V), requires the state plan to provide for a period of ineligibility for nursing facility services ... in the case of an institutionalized individual ... who ... at any time during or after the 30 month period immediately before the date the individual becomes an institutionalized individual ... or... the date the individual applies for such assistance while an institutionalized individual disposed of resources for less than fair market value. The period of ineligibility shall begin with the month in which such resources were transferred and the number of months in such period shall be equal to the lesser of
(A) 30 months, or
(B)(i) the total uncompensated value of the resources so transferred, divided by (ii) the average cost, to a private patient at the time of the application, of nursing facility services in the State or, at State option, in the community in which the individual is institutionalized.
42 U.S.C. § 1396p(c)(1); Fla. Admin. Code r. 65A-1.712(g).
[4] Section 217 of the Health Insurance Portability and Accountability Act of 1996 added certain criminal penalties for improper transfers of assets by Medicaid applicants. Congress later eliminated the criminal penalties against persons transferring the assets but made it a crime for others to counsel a person to make such a transfer. 42 U.S.C. § 1320a-7b. Subsequently, the District Court for the Northern District of New York and United States Attorney General Janet Reno declared the law unconstitutional. See New York State Bar Ass'n v. Reno, 999 F.Supp. 710 (N.D.N.Y., 1998).
[5] For example, transfers not made for the purpose of qualifying for Medicaid will not result in ineligibility. 42 U.S.C. § 1396p(c)(2)(C). The transfer of assets for the sole benefit of the applicant's spouse may be exempt, 42 U.S.C. § 1396p(c)(2)(B)(i),(ii), as may a transfer to a trust for the benefit of the applicant's blind or disabled child. 42 U.S.C. § 1396p(c)(2)(B)(iii), (iv). In some instances, the transfer of an individual's home will not constitute an uncompensated transfer. See 42 U.S.C. § 1396p(c)(2)(A). None of the exemptions permitted under law apply to this case.
[6] Both the verified petition and counsel at oral argument alleged that there would be no penalty provision for purposes of Medicaid after the proposed transfer.
[7] Examples of states which use the "best interests" standard are Arizona, Illinois, Minnesota, New York, and Ohio. See, e.g., Countryman v. Henderson, 17 Ariz.App. 218, 496 P.2d 861, 863 (1972); Matter of Saphier, 167 Misc.2d 130, 637 N.Y.S.2d 630, 631 (Sup.Ct. 1995). Massachusetts and Florida have applied the substitute judgment standard to decisions made by guardians. See Guardianship of Doe, 411 Mass. 512, 583 N.E.2d 1263, 1267 (1992); In re Guardianship of Bohac, 380 So.2d 550 (Fla. 2d DCA 1980), infra.